**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. _____

QDOBA RESTAURANT CORPORATION

        Plaintiff,

v.

ZURICH AMERICAN INSURANCE COMPANY

        Defendant.

_____

**COMPLAINT**
_____

Plaintiff Qdoba Restaurant Corporation ("Qdoba") complains of Defendant Zurich American Insurance Company ("Zurich") and alleges as follows:

**<u>NATURE OF THIS ACTION</u>**

1.      By this Action, Qdoba seeks to collect bargained-for coverages under a Zurich EDGE™ all-risk commercial property policy (the "Policy") for losses suffered due to the Coronavirus[1] pandemic and the related governmental authorities (including the various governmental stay-at-home and business closure orders) across the United States, including in Colorado. Qdoba's operations nationwide have been and continue to be suspended (as that term is used in Zurich's Policy) and threatened by the ongoing and increasingly dangerous conditions

_____

[1] The terms "Coronavirus" and "Covid-19" are often used interchangeably in common parlance. Technically, Coronavirus is a virus and Covid-19 is a disease that is caused by Coronavirus. *See ¶* 14 *infra.*

1

created by the Coronavirus pandemic.  Starting in early March 2020, and continuing through to the present, in order to avoid the near certain risk of danger and harm to its employees and customers, and physical loss or damage to its covered premises, Qdoba has been forced to suspend or reduce its business operations at many of its covered premises.  Qdoba has also been forced to take necessary steps to prevent further physical loss of or damage to its property and minimize the suspension of its business and operations to the extent possible.

2.      By the express terms of its Policy, Zurich promised to pay for Qdoba's losses resulting from the necessary suspension of Qdoba's business operations, in circumstances such as those at issue, here.  Instead of performing on its promises, Zurich has repudiated its contractual duties it owes to Qdoba and has unreasonably withheld payment.

3.      Incorporated in Colorado, Qdoba is a national fast-casual restaurant providing dine-in, carry-out and catering services with operations throughout the United States.  Qdoba purchased the Policy from Zurich for the express purpose of obtaining broad multi-risk protection for losses that might be incurred due to various causes of loss or damage to its restaurants and property nationwide, including with respect to its Colorado locations.

4.      As of March 2020, the Qdoba system included 735 restaurants, of which 349 are company owned, and 386 franchise-owned, in 45 states, the District of Columbia and Canada. With 74 company owned Qdoba restaurants in Colorado, there are more company owned restaurants in Colorado than in any other state.

5.      Zurich was aware when it sold the Policy to Qdoba of Qdoba's intent to purchase full all risks coverage for its restaurant system, in exchange for which Zurich collected substantial premiums.

6.      Qdoba's losses are covered under multiple applicable coverage parts of the Policy, and are not subject to any exclusion.  Zurich has nonetheless wrongfully and unreasonably refused

to reimburse Qdoba for its losses, by wrongfully claiming that the Policy has not been triggered because Qdoba's losses have not resulted from "loss of" or "damage to" Qdoba locations.  Zurich has also wrongfully argued that even if its coverage is triggered, a Policy exclusion applies.

7.     The Policy that Zurich sold to Qdoba defines a "Covered Cause of Loss" as "[a]ll *risks of* direct physical loss of or damage from any cause unless excluded."  (emphasis added). The Policy expressly insures against all "risks" -- or threats -- of direct physical loss of or damage to property.  Under the Zurich Policies' terms, coverage is provided to Qdoba where, among other circumstances, Qdoba's use of its property was diminished or restricted to prevent the *risk* of spreading Coronavirus and the *risk* of loss of or damage to its property.  Qdoba was as a result deprived of physical use of it premises.

8.     Contrary to its promise to cover such risks, Zurich has improperly rejected coverage under the Policy.  Zurich's breach of its promise improperly deprives Qdoba of the benefits for which it paid substantial premiums.  Qdoba thus seeks the relief addressed below in this Complaint.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 1332 because Qdoba and Zurich are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

10.     Venue is proper in this District under 28 U.S.C. Section 1391(b) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendant is licensed to transact and transacts business in this District, and Defendant is subject to personal jurisdiction in this District.

## THE PARTIES

11.     Qdoba is a Colorado corporation with its principal place of business and headquarters in San Diego, California.

12.     Qdoba is informed and believes, and on that basis alleges, that Zurich is a New York corporation with its principal place of business in Schaumburg, Illinois.  Zurich is licensed and authorized to transact, and is regularly transacting, business in the State of Colorado.

## THE CORONAVIRUS PANDEMIC

13.     In December 2019, during the term of Policy, the first instance of a respiratory illness caused by a novel coronavirus was identified in Wuhan, China.  In a matter of weeks, the virus quickly spread across Asia, the United States and most of the world.

14.     On February 11, 2020, the International Committee on Taxonomy of Viruses named this novel coronavirus "severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2)" (the "Coronavirus").  The same day, the World Health Organization ("WHO") named the disease caused by the Coronavirus, "COVID-19."

15.     In January 2020, the first reported case of Coronavirus occurred in the United States.

16.     On March 11, 2020, the WHO declared the Coronavirus outbreak a worldwide pandemic[2] and noted its deep concern "by the alarming levels of spread and severity [of the Coronavirus]."

17.     According to numerous public health authorities, ***everyone*** is at risk of exposure to Coronavirus and falling ill with COVID-19.  Due to its highly contagious and easily transmitted nature, a single instance of Coronavirus in a community can (and as time has progressed, does) quickly and exponentially grow into a massive, uncontainable outbreak.

18.     Coronavirus has rapidly spread and continues to spread throughout the United

---

[2] *See* World Health Organization, *WHO Director-General's opening remarks at the media briefing on COVID-19 - 11 March 2020* (Mar. 11, 2020), https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020 (last visited November 30, 2020).

States and the world.  It is a human pathogen; it is present in viral fluid particles in the air, as well as on surfaces (*e.g.*, walls, furniture, doors, fixtures, countertops and touch screens).  It is highly contagious and easily transmitted from person to person or from surface to person.

19.     Coronavirus has several modes of transmission.  According to the WHO and the Centers for Disease Control and Prevention ("CDC"), Coronavirus can spread from person to person through physical droplets from the nose or mouth that are spread when an infected person sneezes, coughs or exhales.  The physical droplets then land on nearby objects and surfaces, where Coronavirus remains active and dangerous (even on inert objects and surfaces) for long periods of time.  People "catch" Coronavirus by being in the vicinity of a person who has Coronavirus and breathing in shed droplets, or by touching objects or surfaces on which droplets landed and then touching their own eyes, nose or mouth.  Those people then further spread Coronavirus throughout their environments and communities in the same manner.

20.     Coronavirus has spread widely in this manner, in Colorado and nationwide, including through interactions with physical property inside premises, and encounters with airborne particles within premises.

21.     Importantly, even asymptomatic infected persons (*i.e.*, those who have no sign of illness) can and do spread Coronavirus.[3]  In fact, studies have estimated that over 40% of infected individuals may never develop symptoms, yet still spread Coronavirus through physical droplets.[4]

22.     According to the WHO, the incubation period for the COVID-19 disease—*i.e.*, the

---

[3] *See World Health Organization, Coronavirus disease 2019 (COVID-19) Situation Report – 73* (Apr. 2, 2020), https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200402-sitrep-73-covid-19.pdf?sfvrsn=5ae25bc7_2 (last visited November 30, 2020).

[4] *See, e.g.* Erika Edwards, *Asymptomatic COVID-19 Cases May Be More Common Than Suspected* (May 27, 2020, 1:43 PM)*,* https://www.nbcnews.com/health/health-news/asymptomatic-covid-19-cases-maybe-more-common-suspected-n1215481 (last visited November 30, 2020).

time between exposure to the Coronavirus and symptom onset—can be up to 14 days.  Other studies suggest that the period may be up to 21 days. Before infected individuals exhibit symptoms, *i.e.*, the so-called "pre-symptomatic" period, they are the most contagious, as their viral loads will likely be very high, and they may not know they have become carriers.

23.     According to a report in *The New York Times*, "[a]n infected person talking for five minutes in a poorly ventilated space can also produce as many viral droplets as one infectious cough."[5]  And, one human sneeze can expel droplets that can travel up to 27 feet at nearly a hundred miles an hour.[6]  Thus, the WHO has reported that airborne transmission of Coronavirus may be possible in certain circumstances, and "is different from droplet transmission as it refers to the presence of microbes within droplet nuclei, which…[can] be transmitted to others over distances greater than 1 m."[7]

24.     Respiratory droplets expelled from infected individuals land on, attach, and adhere to surfaces and objects. In doing so, they physically change the property and its surface by becoming a part of that surface.  As a result of this physical alteration, contact with those previously safe, inert surfaces (*e.g.,* walls, tables, countertops) has been made unsafe.

25.     Numerous scientific studies have documented that Coronavirus can remain on and cause physical to property for extended periods of time.  For example:

---

[5] *See* Yuliya Pashina-Kottas, *et al.*, This 3-D Simulation Shows Why Social Distancing Is So Important, *The New York Times* (April 14, 2020), *available at* https://www.nytimes.com/interactive/2020/04/14/science/coronavirus-transmission-cough-6-feet-ar-ul.html (last visited November 30, 2020).

[6] *See* Sarah Gibbens, "See how a sneeze can launch germs much farther than 6 feet," *National Geographic* (April 17, 2020), https://www.nationalgeographic.com/science/2020/04/coronavirus-covid-sneeze-fluid-dynamics-in-photos/ (last visited November 30, 2020).

[7] *See* World Health Organization, *Modes of Transmission of Virus Causing COVID-19: Implications for IPC* (Mar. 29, 2020, updated on July 9, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations (last visited November 30, 2020).

a. A study documented in the *New England Journal of Medicine* found that Coronavirus is detectable in aerosols (*i.e.*, fine solid particles in air) for up to three hours, on copper for up to four hours, on cardboard up to 24 hours and on plastic or stainless steel for ***up to two to three days***.[8]

b. Another study found that human coronaviruses, such as SARS-CoV and MERS-CoV, can remain infectious on inanimate surfaces and objects at room temperature for ***up to nine days***.[9]   Such surfaces, materials and objects are common in restaurants and include high-traffic items such as door knobs, countertops, tables and chairs.

c. A peer-reviewed article published in *Virology Journal* on October 7, 2020 found that Coronavirus can survive on surfaces for ***up to 28 days*** at ambient temperature and humidity (20 °C [68 °F] and 50% RH).[10]   The article concludes that Coronavirus "can remain infectious for significantly longer time periods than generally considered possible."

26.   Accordingly, because an individual with no symptoms can spread Coronavirus simply by breathing or talking, and because droplets containing Coronavirus can land and remain infectious on surfaces for many days, the risks posed by Coronavirus are not temporary.   Even

---

[8] *See* News Release, *New Coronavirus Stable for Hours on Surfaces*, NAT'L INSTS. OF HEALTH (Mar. 17, 2020), *available at* https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces (last visited November 30, 2020).

[9] *See* G. Kampf *et al.*, *Persistence of Coronaviruses on Inanimate Surfaces and Their Inactivation with Biocidal Agents*, J. HOSPITAL INFECTION (Feb. 6, 2020), *available at* https://www.journalofhospitalinfection.com/article/S0195-6701(20)30046-3/fulltext (last visited November 30, 2020).

[10] *See* S. Riddell, *et al.*, *The effect of temperature on persistence of SARS-CoV-2 on common surfaces*, 17 Virology J., Art. No. 145 (2020), *available at* https://virologyj.biomedcentral.com/articles/10.1186/s12985-020-01418-7 (last visited November 30, 2020).

when the air and surfaces inside a building are thoroughly and effectively cleaned, each time an infected person enters that space the cycle renews such that infectious Coronavirus is likely (if not certain) to be present whereever people are located or congregate.   The world has seen communities shut down and reopen, only to be shut down again following another outbreak; the risk of spread wherever people are gathered (when indoors or in many instances, outdoors) is a near certainty.   The virtually guaranteed risk of significant harm and damage to persons and property is why it became necessary to close or strictly limit the use of indoor business spaces, such as restaurant dining rooms like those used by Qdoba; and it is why in some instances those closures and restrictions remain necessary today.   For this specific reason (*i.e.*, to prevent the risk of near certain injury to persons and property), Qdoba has since early March 2020 closed certain of its insured restaurant dining rooms, or closed other restaurants entirely only to reopen and then close again, depending upon restaurant locations.   This chain of events has created great risk to Qdoba of direct physical loss of or damage to covered property, in addition to actual direct physical loss of or damage to covered property.

27.   State and local governments and public health officials acknowledge that Coronavirus causes direct physical loss of and damage to property.   For example:

a.   The State of Colorado issued a Public Health Order indicating that "[Coronavirus]…physically contributes to property loss, contamination and damage…";

b.   The City of New York issued an Emergency Executive Order in response to the Coronavirus pandemic, in part "because the virus physically is causing property loss and damage";

c.   Broward County, Florida issued an Emergency Order acknowledging that Coronavirus "is physically causing property damage";

d.      The State of Indiana issued an Executive Order recognizing that Coronavirus has the "propensity to physically impact surfaces and personal property";

e.      The City of New Orleans issued an order stating "there is reason to believe that [Coronavirus] may spread amongst the population by various means of exposure, including the propensity to attach to surfaces for a prolonged period of time, thereby spreading from surface to person and causing property loss and damage in certain circumstances";

f.      The City of Los Angeles issued an Order in response to the Coronavirus pandemic "because, among other reasons, the COVID-19 virus [*i.e.* Coronavirus] can spread easily from person to person and it is physically causing property loss or damage due to its tendency to attach to surfaces for prolonged periods of time";

g.      Dallas County, Texas issued an Emergency Order recognizing that "the virus is physically causing property damage due to its proclivity to attach to surfaces for prolonged periods of time".

28.     The actual and/or threatened presence of Coronavirus particles at certain Qdoba locations, has rendered physical property within those premises damaged, unusable, uninhabitable, unfit for intended function, dangerous, and unsafe. It has impaired and diminished the value, utility and normal function of those premises (including the physical property contained within them). Similarly, the presence at Qdoba locations of individuals infected with Coronavirus, or carrying Coronavirus particles on their body (including their clothing and any other objects on their body), has rendered and/or created the risk of the premises and the physical property located there unusable, damaged and unsafe. These circumstances have caused and can continue to cause and/or

9

create the risk of direct physical loss of and damage to the covered premises and property.  And, as to premises where Coronavirus has not in fact specifically been identified, given the nature of the disease, the risk of such consequences is near certain, if not certain.

29.    Zurich's own webpage admits the physical dangers associated with Coronavirus, advising customers to rely on the *New England Journal of Medicine*, the CDC, and other similar sources for advice as to how long the virus survives on surfaces and touch points.[11]  Zurich has underscored the need to repeatedly disinfect these surfaces, and to employ social distancing as an additional safety precaution.

30.    The Policy expressly insures against the "risks" of Coronavirus making Qdoba properties unusable, damaged or unsafe.

## ZURICH'S KNOWLEDGE OF
## THE RISKS AND DANGERS OF THE PANDEMIC

31.    Insurers were repeatedly warned, and have been aware for years, of the potential impact of pandemics.  In fact, there were many publicly available reports about the risk of pandemics – and what insurers should do – in the months and years before the Coronavirus pandemic.  For example:

a.    One article noted in March 2018: "Even with today's technology, a modern severe pandemic would cause substantive direct financial losses to the insurance community. In addition, indirect losses would be severe, most notably on the asset side of the balance sheet."[12]

---

[11] *See Facility & office disinfection during the COVID-19 crisis* (May 13, 2020), https://www.zurichna.com/knowledge/articles/2020/05/disinfecting-offices-and-facilities-during-the-covid-19-crisis (last visited November 30, 2020).
[12] *See* "What the 1918 Flu Pandemic Can Teach Today's Insurers," *AIR* (Mar. 29, 2018), https://www.air-worldwide.com/publications/air-currents/2018/What-the-1918-Flu-Pandemic-Can-Teach-Today-s-Insurers/ (last visited November 30, 2020).

     b.   The Insurance Library Association of Boston (founded 1887) lists on its website more than 20 topical articles, reports, and white papers available to insurers from early 2007 through 2018.

32.     Moreover, over the course of decades, courts have held that the presence of a hazardous substance in property, including the airspace inside buildings, constitutes property damage.  Many courts have also held that the closure of property due to imminent risk of physical loss or damage or danger to inhabitants constitutes direct physical loss of property.  Upon information and belief, insurers, including Zurich, have been and continue to be aware of these court decisions.

33.     In 2006, the Insurance Services Office ("ISO"), which is the insurance industry's drafting organization, considered the need to draft an exclusion that would bar coverage for losses caused by a virus, and in July 2006 ISO prepared a circular as part of its filing with state insurance regulators of a standard exclusion of loss due to human disease causing viruses and bacteria.  In that circular, ISO cited "rotavirus, SARS, [and] influenza" and observed that "[t]he universe of disease-causing organisms is always in evolution."

34.     ISO's circular further recognized that, "Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property."  ISO also expressly warned of a need for its exclusion because "the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing [property] policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent."

35.     With its circular ISO thus acknowledged that (i) the presence of a human disease causing virus could give rise to physical damage to property; (ii) such damage could trigger

coverage under property policies for property losses, including business interruption losses; and (iii) absent ISO's exclusion, the existing language in property policies, like that issued by Zurich to Qdoba, here, did not bar coverage for such losses.

36.     ISO therefore introduced with its circular a standard-form exclusion that it entitled "Exclusion Of Loss Due To Virus Or Bacteria" (form CP 01 40 07 06 and, in certain jurisdictions, form CP 01 75 07 06).  As noted in the circular, the purpose of this standard form language was to allow those insurers that chose to use it in their insurance policies, to attempt to protect themselves from coverage for loss or damage resulting from infectious material and pandemic.

37.     Accordingly, since 2006 insurers have had the opportunity to incorporate, and have incorporated, this standard virus exclusion in certain of their policies in an effort to avoid covering loss due to a disease such as COVID-19.  Some insurers went a step further and sought to bar coverage by including in their policies their own express "pandemic," "infectious disease" or other similar broad human disease-based exclusions.

38.     Zurich nonetheless chose to not include the ISO or other more express pandemic or human disease-based exclusion(s) in the Policy.

**GOVERNMENTAL RESPONSES TO THE PANDEMIC**

39.     On March 16, 2020, the CDC and the national Coronavirus Task Force issued guidance titled "30 Days to Slow the Spread" of Coronavirus.  The guidance called for extreme social distancing measures, such as working from home, avoiding gatherings of more than 10 people, and avoiding bars and restaurants.

40.     State governments across the nation recognized the unprecedented and catastrophic situation.  Colorado, California, Illinois, New York, Washington and many other states issued "state of emergency" declarations in early March.

41.     Within a short time, all states where Qdoba conducted operations issued orders

suspending or severely limiting business operations of nonessential businesses where people could almost certainly contract COVID-19 from others or the property itself.  These orders included limiting the seating capacity in restaurant dining rooms or closing restaurant dining rooms altogether.

42.     Simultaneously or shortly thereafter, states across the country issued orders encouraging or requiring citizens to "shelter in place" or "stay at home."

43.     In many instances, city and county governments issued their own restrictive orders, which among other things limited the capacity of or closed restaurant dining rooms.

44.     Commencing in early March 2020, as a result of the risks associated with the Coronavirus pandemic, including direct physical loss of or damage to covered property, and in compliance with government guidance and orders, Qdoba was forced to close or limit the use of its restaurant dining rooms at numerous of its locations, and transitioned to "to-go," pick-up and delivery-only service across the Qdoba system.  Carry-out and catering services were also substantially diminished as a result of the near certain risks of spreading Coronavirus, the very risk that formed the bases for the government orders.  In addition, several other of Qdoba's company owned and franchise restaurants were temporarily closed completely.

45.     Qdoba subsequently reopened some dining areas as subsequent government orders permitted.  In some areas, Qdoba's dining areas were operational – but only with limited use or seating capacity.  In other areas, Qdoba's dining areas were operational, but they suffered substantially reduced sales volumes due to the closure of nearby or adjacent properties that attracted customers to such Qdoba premises.  As of June 2020, approximately 65 restaurants remained temporarily closed.  As of December 2, 2020, eleven restaurants were still closed, with other closures and restrictions mandated in real time as the pandemic continues to become more dangerous.

46.     The risks of Coronavirus, as recognized in the government orders, also caused direct physical loss of or damage to Qdoba's Dependent and Attraction Properties, as those terms are defined in the Policy.  Several of Qdoba's restaurants are located within or adjacent to other properties such as malls, universities, military facilities, airports and urban office buildings.  The losses suffered by these Attraction and Dependent Properties resulted in a slowdown or cessation of Qdoba's dining, carry-out and catering services.

## THE IMPACT OF CORONAVIRUS

47.     The economic fallout of the Coronavirus pandemic has been massive and devastating to people, businesses, and local governments.

48.     As of November 30, 2020, Coronavirus has been detected in nearly every country.  Total reported cases top 62.8 million people, and more than 1.46 million people have died.  In the United States alone, more than 13.4 million people have tested positive for COVID-19, and more than 267,000 people have died as a result of it.

49.     The states', cities' and counties' attempt at phased reopenings in the summer and fall of 2020 did not help matters.  As some visitors cautiously returned to patronize businesses, so did Coronavirus – leading many localities to reimpose restrictions on businesses, including restaurants, to combat the latest surge.

50.     For these reasons, it is virtually certain that Coronavirus presents a continued risk of direct physical loss of or damage to Qdoba's properties.  Each time any person enters a place of business, so do the risks associated with Coronavirus.

51.     Indeed, if Qdoba were to conduct business as usual, the disease and virus spread would be inevitable.  Under these circumstances, Qdoba's properties cannot be used according to their intended function as restaurants providing seated dining, carry-out, and catering services.

52.     Qdoba implemented multiple cost optimization and reduction actions to reduce

operating expenses and mitigate against additional loss.  These actions included headcount reductions, adjusting labor hours, eliminating discretionary general and administrative expenses, deferring restaurant lease payments, reducing advertising spend and postponing capital projects.

## THE ZURICH INSURANCE POLICY

53.     Beginning with its introduction in 2008, Zurich companies marketed the EDGE™ policy form as offering "broader coverage and greater flexibility."  The CEO of Zurich's Global Corporate in North America business unit specifically lauded the form's clarity.

54.     In addition to Zurich's knowledge of the restaurant business in general, and in connection with providing coverage to Qdoba, Zurich engaged, or had reasonable opportunities to engage in, an extensive underwriting investigation and to become familiar with and knowledgeable about the nature and scope of Qdoba's business  and the nature of the risks against which it was insuring.

55.     In exchange for substantial premiums, Zurich sold Qdoba the Policy, effective from March 21, 2019, to March 21, 2020.  A true and correct copy of the Policy is attached hereto as **Exhibit A** and incorporated by reference.

56.     The Policy covers risks of direct physical loss of or damage to Qdoba's company owned restaurants.  It also covers Qdoba's loss when there is loss of or damage to Qdoba's franchises, as well as loss of or damage to other Dependent and Attraction Properties such as malls, universities, military facilities, airports, and urban office buildings.

57.     The Policy provides coverage for building and personal property losses, for business interruption losses ("Time Element"), and other losses.  The policy limit is $75 million, which is subject to certain deductibles, sublimits and other conditions.

58.     The Policy contains sublimits for certain losses, but others are subject to the full $75 million policy limit.  As sought by Qdoba, the limit of liability for combined Property Damage

and Time Element (business interruption) at scheduled locations is the full $75 million limit.

59.     The Insuring Agreement in the Policy provides, in relevant part, that the Policy "[i]nsures against direct physical loss of or damage caused by a Covered Cause of Loss to Covered Property, at an Insured Location. . ." The term "Covered Cause of Loss" is defined as "[a]ll risks of direct physical loss of or damage from any cause unless excluded."

60.     Therefore, the Policy expressly insures against the "risks," *i.e.,* threats of direct physical loss of or damage to property.

61.     If the Policy does not expressly exclude a particular cause of a risk of physical loss of or damage to property, then the non-excluded peril triggers coverage.

62.     The risk of spread of Coronavirus causes direct physical loss of or damage to property, and the Policy includes no enforceable exclusion that would preclude coverage for such risks of loss of or damage to covered property.

63.     The Policy explicitly recognizes that a risk of contamination or other damage to property not visible to the eye constitutes "direct physical loss of or damage" to property.  For example:

    a.     The Policy contains a sublimit for ammonia contamination resulting from a Breakdown of Covered Equipment at a Scheduled Location.

    b.     The Policy contains a sublimit for radioactive contamination.

    c.     The Policy contains a sublimit for certain "Decontamination Costs" where a property is Contaminated and there is a law or ordinance regulating the Contamination due to the "actual" presence of Contaminant(s). The terms "Contaminated" and "Contamination" are defined by endorsement to mean: "Any condition of property due to the actual presence of any Contaminant(s)." The term "Contaminant(s)" is defined by endorsement to mean: "Any solid,

16

liquid, gaseous, thermal or other irritant, including but not limited to smoke, vapor, soot, fumes, acids, alkalis, chemicals, waste (including materials to be recycled, reconditioned or reclaimed), other hazardous substances, Fungus or Spores."

### *The Policy's Property Damage Coverage Applies*

64.    The "Property Damage" section of the Policy provides coverage for property, including personal property, at or within 1,000 feet of Qdoba's locations against "direct physical loss of or damage" caused by a Covered Cause of Loss.

65.    Covered Cause of Loss means "[a]ll *risks* of direct physical loss of or damage from any cause unless excluded." (emphasis added).

66.    The Policy therefore covers the "risks" of direct physical "loss of" *or* "damage" to Qdoba's property.  Even if Qdoba's property did not suffer physical "damage," the Policy still provides coverage for the risks of Qdoba's physical "loss of" its property.

67.    The term "loss of" is not defined in the Policy.  Dictionary definitions of "loss" include:

    a.    "Deprivation."  Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss

    b.    "[D]ecrease in amount, magnitude, or degree." Loss, Merriam-Webster, https://www.merriam-webster.com/dictionary/loss

    c.    "The fact that you no longer have something or have less of something." Loss, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/loss?q=Loss

    d.    "Having less than before."  Loss, Macmillan Dictionary, https://www.macmillandictionary.com/us/dictionary/american/loss

e.      "[T]he state of no longer having something or as much of something."

Loss, Oxford Advanced Learner's Dictionary,

https://www.oxfordlearnersdictionaries.com/us/definition/english/loss?q=l
oss

68.      At minimum, Qdoba suffered "deprivation," "decrease," or "having less" of its covered property due to this Coronavirus pandemic.

69.      Qdoba faced and continues to face the imminent "risk" of physical loss of or damage to its property because of the ongoing and increasingly dangerous pandemic.

70.      Accordingly, the Policy's "Property Damage" coverage is triggered, and Qdoba's loss of or damage to its property is covered by the Policy.

*The Policy's Business Interruption (Time Element)*
*and Extra Expense Coverages Apply*

71.      The "Time Element" section of the Policy provides coverage for the "actual Time Element loss the Insured sustains" during the Period of Liability resulting from "the necessary Suspension of the Insured's business activities at an Insured Location" where the Suspension is due to direct physical loss of or damage to covered property caused by a Covered Cause of Loss.

72.      Covered Cause of Loss means "[a]ll *risks* of direct physical loss of or damage from any cause unless excluded." (emphasis added).

73.      "Suspension" is defined to include the "slowdown or cessation of the Insured's business activities."

74.      The Policy therefore provides business interruption coverage when, as is and was true for Qdoba, the insured suffers a slowdown or cessation of its business activities due to physical loss of or damage to covered property caused by the "risks" of the Coronavirus pandemic.

75.     The Policy also provides coverage for "Extra Expenses," which are defined as "the amount spent to continue the Insured's business activities over and above the expenses the Insured would normally have incurred had there been no direct physical loss of or damage to" covered property.

76.     Qdoba slowed or ceased its operations at covered restaurants because of the imminent "risk" that Coronavirus would cause direct physical loss of or damage to covered property.

77.     Qdoba has incurred and will continue incurring expenses over and above the expenses it would have normally incurred had there been no direct physical loss of or damage to its covered property.

78.     Accordingly, the Policy's "Time Element" (including Extra Expense) coverage is triggered, and Qdoba's business interruption losses are covered by the Policy's Time Element coverage.

### *The Policy's Contingent Time Element Coverage Applies*

79.     The Policy covers Qdoba's business interruption loss if the suspension of its business activity results from direct physical loss of or damage caused by a Covered Cause of Loss to property at Direct Dependent Time Element Locations and/or Attraction Properties.

80.     Covered Cause of Loss means "[a]ll *risks* of direct physical loss of or damage from any cause unless excluded." (emphasis added).

81.     As defined by the Policy, "Direct Dependent Time Element Location" includes any location of a direct "customer, supplier, contract manufacturer or contract service provider to [Qdoba]" and "[a]ny Location of any company under a royalty, licensing fee or commission agreement with [Qdoba]."

82.     As defined, "Attraction Properties" are "propert[ies] within the distance described in the declarations of an Insured Location that attract[ ] customers to [Qdoba's] business."  The Policy's declarations state that Attraction Properties are located within 1 mile of an insured location.

83.     Qdoba's franchise locations are "Direct Dependent Time Element Locations" as defined by the Policy.  Qdoba's franchises closed dine-in services, and significantly reduced or closed carry-out and catering services, due to the risk and/or presence of Coronavirus and the ensuing government orders, thereby causing Qdoba to suffer a suspension of business activity.

84.     The locations of Qdoba's customers are "Direct Dependent Time Element Locations" as defined by the Policy.  Qdoba's customers reduced or ceased purchasing Qdoba's dine-in, carry-out and catering services due to the risk and/or presence of Coronavirus and the ensuing government orders, thereby causing Qdoba to suffer a suspension of business activity.

85.     Locations such as universities, malls, military facilities, airports and office buildings at or near where Qdoba restaurants are located are "Attraction Properties" as defined by the Policy.  Such locations also closed due to the risk and/or presence of Coronavirus and the ensuing government orders, thereby causing Qdoba to suffer a suspension of business activity.

86.     Accordingly, the Policy's Contingent Time Element coverage is triggered.

*There is No Enforceable Policy Exclusion Applicable to QDOBA's Loss*

87.     A pandemic, such as Coronavirus, is not excluded by the Policy.

88.     Had Zurich wished to exclude pandemic from the Policy, it could have incorporated into the Policy either a specific exclusion (such as a pandemic, infectious disease or other similar express exclusion), or the ISO virus or bacteria exclusion referenced in ¶ 36, *supra*.  Zurich did neither.

89.     Upon information and belief, Zurich was aware of the risk of an infectious disease pandemic such as due to SARS and avian flu prior to issuing the Policy to Qdoba.

90.     Now, after being presented with Qdoba's claim, Zurich is attempting to avoid coverage for an infectious disease pandemic, such as the present Coronavirus pandemic.

91.     In denying coverage, Zurich contended that the Policy's "Contamination" exclusion applied to limit or bar coverage.  Zurich is wrong.

92.     The Policy contains a "Contamination" exclusion that states in relevant part:

> This Policy excludes the following unless it results from direct physical loss or damage not excluded by this Policy.
>
> **Contamination**, and any cost due to **Contamination** including the inability to use or occupy property or any cost of making property safe or suitable for use or occupancy, except as provided by the Radioactive Contamination Coverage of this Policy.

93.     In the base policy form, Zurich defined "Contamination" to include the actual presence of "pathogen or pathogenic organism, bacteria, virus, disease causing or illness causing agent, Fungus, mold or mildew."  But, through an endorsement that was issued at the inception of coverage, Zurich *redefined* the term "Contamination" to delete any reference to pathogen or pathogenic organism, bacteria, virus, and disease-causing illness or agent.  Thus, the "Contamination" exclusion does not extend to Qdoba's Coronavirus-related coverage claims.

94.     The endorsement that modified the definitions of "Contamination/Contaminated" and "Contaminant(s)" was necessary to fix poor draftsmanship that had rendered the original definitions non-sensical.  For example, the "Decontamination Costs" coverage requires that the property is "Contaminated" by the actual presence of "Contaminant(s)."  The original definition of "Contaminant(s)" did not include "virus," but the definition of "Contaminated" did include "virus."  If the original definitions were applied, the Decontamination Costs coverage would be hopelessly ambiguous.

95.     The Contamination exclusion also, on its face, expressly applies to "costs" but makes no mention of "losses."   Qdoba has suffered substantial "losses" as that term is used in Policy, regardless of any incurred "costs."   For multiple reasons, the Contamination exclusion is at best for Zurich ambiguous and must be construed in Qdoba's favor.

96.     Zurich's letters dated April 28, 2020 and July 27, 2020 denying coverage to Qdoba did not raise any other Policy exclusion besides the Contamination exclusion.

### ZURICH'S BREACH OF ITS INSURANCE CONTRACT

97.     Qdoba timely reported its losses to Zurich under the Policy.

98.     Zurich denied coverage to Qdoba by letter dated April 28, 2020.

99.     By letter dated May 27, 2020, Qdoba wrote to Zurich regarding its unreasonable coverage positions in an attempt to resolve the matter.

100.    By letter dated July 27, 2020, Zurich reasserted its coverage denial.

101.    The positions Zurich has taken in its correspondence to Qdoba make clear that it has no intention of covering Qdoba's claim and that any claimed investigation of Qdoba's claim was perfunctory and mere pretext.

102.    Zurich's denial was premised on a knowing or reckless misrepresentation of fact. Indeed, Zurich's own webpage states that (i) Coronavirus spreads when someone touches a "contaminated surface" and then touches their nose or mouth; (ii) a study in the *New England Journal of Medicine* shows "coronavirus particles can remain suspended in the air for up to three hours" and "can also live on various surfaces for up to 72 hours"; and (iii) "given the length of time the coronavirus can linger on certain surfaces," the CDC recommends frequent cleaning of

doorknobs, light switches, faucet handles, computers, countertops, cafeteria tables and coffee pots.[13] All of this equipment is used in Qdoba's restaurants.

103.     Zurich misrepresented the scope of the Policy by, *inter alia,* stating that the Contamination exclusion applies when such exclusion is inapplicable, ambiguous and/or unenforceable.

104.     Qdoba has complied with all terms and conditions contained in the Policy except to the extent its performance has been or is excused or waived by Zurich.

## COUNT I
### Breach of Contract

105.     Qdoba realleges and incorporates by reference all preceding allegations as if fully stated herein.

106.     The Policy is a valid and enforceable contract between Qdoba and Zurich.

107.     Qdoba has sustained, and continues to sustain, losses covered under the Policy. Qdoba has provided prompt notice of its losses to Zurich.

108.     Qdoba performed, and was ready to perform, all obligations required of it under the Policy.

109.     Zurich breached the Policy by, among other things, denying coverage to Qdoba and failing to pay for the losses Qdoba sustained.

110.     As a direct and proximate result of Zurich's acts and breaches, Qdoba has been damaged, and continues to be damaged, in an amount that exceeds the Court's jurisdictional limits and to be established at trial.

## COUNT II

---

[13] *See Facility & office disinfection during the COVID-19 crisis* (May 13, 2020), https://www.zurichna.com/knowledge/articles/2020/05/disinfecting-offices-and-facilities-during-the-covid-19-crisis (last visited November 30, 2020).

**Violation of C.R.S.  §§ 10-3-1115, 1116**

111.    Qdoba realleges and incorporates by reference all preceding allegations as if fully stated herein.

112.    Zurich is engaged in the business of insurance.

113.    Qdoba is a first-party claimant as that term is defined under C.R.S. §§ 10-3-1115, 1116.

114.    Zurich unreasonably delayed and/or denied payment of a claim for benefits owed to Qdoba.  Zurich denied payment of a covered benefit to Qdoba without a reasonable basis.

115.    Zurich engaged in willful conduct prohibited by C.R.S. § 10-3-1104 which contributed to Zurich's unreasonable delay and/or denial of payment and Qdoba's injury, including but not limited to:

> Misrepresenting pertinent facts or insurance policy provisions relating to coverages at issue; or

> Failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; or

> Refusing to pay claims without conducting a reasonable investigation based upon all available information; or

> Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear; or

> Compelling insureds to institute litigation to recover amounts due under an insurance policy by offering substantially less than the amounts ultimately recovered in actions brought by such insureds; or

> Failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

116.    Qdoba has suffered injury as a result of Zurich's unreasonable denial of payment of benefits to Qdoba in an amount to be established at trial.

117.    Pursuant to C.R.S. § 10-3-1116, Qdoba is entitled to an award of two times the covered benefits, in addition to the covered benefits, and attorneys' fees and costs from Zurich.

## COUNT III
### Bad Faith Breach of Contract

118.    Qdoba realleges and incorporates by reference all preceding allegations as if fully stated herein.

119.    The Policy contains an implied covenant of good faith and fair dealing under which Zurich agreed to treat its insured fairly, honestly and in good faith, faithfully perform its duties under the Policy, and do nothing to impair, interfere, hinder, or potentially injure its insured's rights to receive the benefits of the Policy.

120.    In breach of the implied covenant of good faith and fair dealing, Zurich did the things and committed the acts alleged above for the purpose of consciously withholding from Qdoba the rights and benefits to which it is entitled under the Policy, and without considering Qdoba's interests at least to the same extent that it considered its own interests.

121.    Zurich's acts are inconsistent with Qdoba's reasonable expectations of the coverage provided by the Policy, are contrary to established claims practices and legal requirements, and constitute bad faith.

122.    As a result of Zurich's bad faith breach of the Policy, Qdoba has suffered damages in an amount to be established at trial.

123.    The injuries resulting from Zurich's bad faith breach of the Policy are attended by circumstances of malicious and willful and wanton conduct, entitling Qdoba to an award of exemplary damages.

## COUNT IV
## Declaratory Judgment

124.    Qdoba realleges and incorporates by reference all preceding allegations as if fully stated herein.

125.    Qdoba contends that Zurich has a duty to pay for Qdoba's losses caused by the risks of the Coronavirus pandemic, including resulting direct physical loss of or damage to covered property, pursuant to the terms and conditions under multiple coverages of the Policy.  Zurich disputes Qdoba's contentions.

126.    Qdoba has complied with all the terms and conditions of the Policy, except to the extent its performance has been or is excused or waived by Zurich.

127.    Qdoba contends that the Policy provides coverage for its losses and that Zurich's coverage analysis to date is contrary to the Policy, the law, and public policy.

128.    Qdoba contends that the Policy must be interpreted in a reasonable manner to provide the coverage that the parties intended and understood was being provided, and that is in accord with Qdoba's reasonable expectations.  Qdoba is informed and believes, and on that basis alleges, that Zurich disputes its contentions.

129.    An actual and justiciable controversy exists between Qdoba and Zurich concerning the matters alleged herein.

130.    Qdoba seeks a judicial declaration confirming: that Zurich's contentions as stated above are wrong, and that Qdoba's contentions as stated above are correct; that Zurich must honor all duties under its Policy, including its duty to pay for the full amount of Qdoba's losses; and that because of Zurich's conduct, Qdoba is excused from performing or complying with any conditions and duties otherwise imposed on Qdoba by the Policy.

131.    Declaratory relief by this Court will terminate some or all of the existing controversy between the parties.

132.    Pursuant to 28 U.S.C. § 2201, Qdoba seeks a declaration by this Court of the rights of Qdoba and the obligations of Zurich under the contractual agreement to provide coverage for Qdoba's losses.

## PRAYER FOR RELIEF

WHEREFORE, Qdoba prays for judgment as follows:

     a.     Judgment in its favor and against Zurich on all claims;

     b.     Compensatory and exemplary damages in connection with the claims asserted, together with expert witness fees and costs, as permitted by law, in an amount to be determined;

     c.     Damages in the amount of two times the covered benefit under the Policy pursuant to C.R.S. § 10-3-1116;

     d.     Attorneys' fees and court costs pursuant to C.R.S. § 10-3-1115 and -1116, as well as any other applicable law;

     e.     Pre-judgment interest, post-judgment interest, moratory interest, and any other interest as permitted by law;

     f.     Declaratory Judgment as set forth in Count IV above; and

     g.     Such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Qdoba hereby demands a trial by jury on all issues so triable.

Dated:  December 4, 2020          Respectfully submitted,

                           BLANK ROME LLP

               By:    /s/ Daniel E. Rhynhart
                       Daniel E. Rhynhart
                       One Logan Square
                       Philadelphia, PA 19103
                       Telephone:  215-569-5500

Email:  Rhynhart@blankrome.com

Linda Kornfeld
(application for admission to be filed)
2029 Century Park East, 6th Floor
Los Angeles, CA 90067
Telephone:  424.239.3400
Email:  lkornfeld@blankrome.com

Lisa M. Campisi
(application for admission to be filed)
1271 Avenue of the Americas
New York, NY 10020
Telephone:  212.885.5000
Email:  lcampisi@blankrome.com

*Attorneys for Plaintiff Qdoba Restaurant Corp.*